United States District Court

For the Northern District of California

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3

4   MICHAEL DAVID CATA,                              No. C 03-3096 PJH (PR)

5                    Petitioner,

6       v.                                           **ORDER DENYING PETITION
                                                     FOR WRIT OF HABEAS
7   SILVIA GARCIA, Warden,                           CORPUS**

8                    Respondent.                     (Docket no. 24)

    _____/

9

10      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

11   2254.  In response to the court's order to show cause, respondent has filed an answer and

12   a memorandum of points and authorities in support of it, and has lodged supporting

13   exhibits.  Petitioner has responded with a traverse.  The case is ready for decision.

14                              **BACKGROUND**

15      The California Court of Appeal summarized the detailed underlying facts as follows:

16   *Irene S.*

17      Fifty-one-year-old Irene S. used to be a homeless person living at the
     shelter in Santa Cruz.  Although she moved to Watsonville, she maintained
18   contacts with some of the people who ran the shelter, as well as some of the
     residents of the shelter.  On October 25, 1999, Irene returned to Santa Cruz
19   to settle a ticket she received there.  She spent the night with a friend at an
     encampment by Granite Construction Company, near the homeless shelter.

20
        Irene left the campsite the next morning and started to walk to the
21   homeless shelter.  While walking along a pathway towards the shelter she
     met appellant.  Irene had seen appellant before at the shelter.  At that time
22   appellant had a cast on his leg.  Irene and appellant talked for a while and he
     offered her a Cobra beer.  After about an hour, appellant asked Irene to go
23   with him to the other side of the campground to drink another beer.  Irene
     agreed to go along with appellant, however, when they arrived at the other
24   campground appellant asked Irene to orally copulate him.  When she refused
     he became angry and called Irene a "bitch," "whore," "stupid" and "redskin."
25   When Irene attempted to leave, appellant refused to let her go and pushed
     her to the ground.

26
        As Irene lay on the ground, appellant pushed her face into the dirt.  He
27   sat on her back.  He turned her over, took off her clothes, and stuffed her
     socks into her mouth to try to keep her from screaming.  When Irene fought
28   appellant he threatened to kill her.  He tied her hands and feet with the laces
     from her shoes.  Appellant fondled Irene's breasts and placed his penis on

1   her face, breasts and stomach.  Also, he tried to place his penis in her mouth,
2   but was prevented from so doing by the sock in her mouth.  Appellant stuck
    his hand in her vagina and ejaculated onto her face and breasts.

3       Irene passed out several times during the assault.  She continued to
    struggle, fearing that she would die.  Appellant continued striking Irene and
4   threatened to stick the "Cobra bottle inside [her] vagina and sticks and all
    kinds of things."  He said that he would keep her prisoner for three days.
5   Irene could not recall how long the assault lasted.  Nor could she remember
    when appellant left.  She passed out for a while.  When she regained
6   consciousness, it was dark and appellant was nowhere to be seen.  Irene
    tried to untie herself and was partially successful.  However, she could not
7   see to untie her feet.  She was not able to accomplish that until the next
    morning, after which she put on some of her clothes before she went to the
8   shelter to look for help.

9       Irene reported the assault to someone at the shelter.  When Officer
    Christina Bentley responded to the shelter she found paramedics attending to
10  Irene.  Irene had a brace around her neck and had been crying.  Officer
    Bentley noticed that Irene was shaking, her fists were in her lap and she was
11  very nervous.  The officer did not notice any odor of alcohol on Irene.  Irene
    was taken from the shelter by ambulance to the hospital where she
12  underwent an examination.  She complained of a great deal of pain in her
    neck, lower back, jaw area, back of her head, and arms.  Irene had bruises on
13  her face and mouth.  There were cuts and dried blood on her lips, and her lips
    and cheeks were swollen.  Also, her arms were bruised and she had trouble
14  talking because her jaw was very sore.  It was difficult for her to open her
    mouth to speak.

15
        Christina Gonzales, a nurse with the Santa Cruz Sexual Assault
16  Response Team, conducted an examination of Irene later that day.  Gonzales
    noticed that Irene appeared to be in a great deal of pain and  moved very
17  slowly.  Due to the extent and severity of Irene's injuries the examination took
    eight hours.  Leaves and debris were found in Irene's hair, dried blood was in
18  her mouth, and there were numerous bruises over her entire body.

19      Irene's injuries included abrasions, lacerations and bruises on her
    forehead, nose, lips, eye, neck, cheek, arm, elbow, ankle, knee, buttocks,
20  back and groin.  Also, there were injuries to Irene's vaginal area consistent
    with forced trauma.  Gonzales opined that the injuries were probably caused
21  by non-consensual sex.  The injuries to Irene's mouth were consistent with
    her being tied around the mouth.  The neck injuries were consistent with
22  someone trying to choke her.

23      Using a special fluorescent lamp to examine Irene for sperm and
    saliva, Gonzales collected swabs of a dried white crusty material on Irene's
24  eye and forehead.  These swabs were examined by Department of Justice
    criminalists and found to contain semen.  DNA from the semen sample
25  exactly matched appellant's DNA profile.  The chance of this profile occurring
    in another individual was 1 in 5.3 to 15 trillion African Americans, 1 in 1.2
26  trillion to 5.1 trillion Caucasians, and 1 in 26 to 39 trillion Hispanics.

27      Officer Bentley collected Irene's boots as evidence and noticed that the
    boots were not completely laced up.  Irene's socks had been stretched
28  beyond their normal size.  When Officer Bentley went to the scene of the

**United States District Court**
For the Northern District of California

alleged attack she found leaves that matched the leaves in Irene's hair. In one spot, the leaves had been spread out and matted into the dirt. Irene's underwear and a 40-ounce bottle of King Cobra were recovered from the spot.

Dr. Weinstein, a psychiatrist at Dominican hospital, treated Irene on January 22, 2000. She was brought into Dominican in a disorganized mental state with delusional beliefs about being killed and/or raped. The doctor believed these thoughts were delusional because Irene was alive and not being killed. She was uncooperative and was unable to answer a lot of questions asked of her.

Gary Reaves, a client specialist at County Mental Health, treated Irene on January 21, 2000. She complained that her primary care doctor was cutting people into pieces and that all her bones were broken. Following an evaluation of Irene, none of her claims were substantiated. Irene left the emergency room, but instead of returning home, she went back and proceeded to walk around. Reaves evaluated Irene a second time. Irene told Reaves that there was a contract out on her life and that she could not return to the shelter because she had been raped there. A check by Reaves confirmed there had been a documented recent sexual assault. However, Irene did not give him any information regarding being raped at the River Street shelter.

Dr. Teverbaugh of County Mental Health treated Irene on several occasions. On February 18, 2000, Irene saw him for a mental health status examination and for a refill of her medications. The doctor found Irene's relatedness was good. She spoke spontaneously, was neither depressed nor excited and was goal-directed. He noted that she had been recently hospitalized for psychosis and Irene felt that she had been raped recently. She stated that she was still in pain from broken ribs and a broken jaw, although he could find no evidence of this.

On July 27, 2000, when Dr. Teverbaugh saw Irene again, she reported that she was still hearing voices and having paranoid feelings. She gave the doctor more details of the rape, stating that it occurred in October and that she was still receiving medical treatment for kidney and bladder problems, which she attributed to the rape.

Dr. Teverbaugh saw Irene on August 10, 2000. At this time, Irene complained of joint pain as well as gynecological problems. She attributed these problems to the rape she suffered the previous fall. Dr. Teverbaugh thought that Irene was holding persistent delusions about the rape. He changed his opinion after reviewing records that showed Irene was examined at Dominican for sexual assault.

*Nancy B.*

Forty-nine-year-old Nancy B. was a homeless woman living in Santa Cruz. She camped near the River Street [s]helter. During July 1997, she was staying at a camp that everyone called "Camp Crusty." Appellant approached her while she was alone listening to the radio. Appellant had a cast on his foot. Nancy B. had seen appellant around the homeless shelter once or twice and she knew his name was Mike. Appellant asked her if she wanted to smoke some marijuana. She agreed and took a puff of appellant's marijuana

1    pipe.

2         When she tried to hand back the marijuana pipe, appellant grabbed the
3    back of her hair and slammed her down onto the dirt.  Appellant placed his
     elbow against her throat.  She struggled to breathe and was unable to
     scream.  While appellant was lying on top of her, he removed her pants and
4    raped her.

5         After the assault, which lasted about ten minutes, appellant got up and
     left the camp.  Nancy B. was scared and in shock.  She felt pain in her chest,
6    neck, and legs.  Pain in her vaginal area lasted a few days.  She did not
     report the assault to the police at the time because she was afraid that she
7    had done something to encourage appellant.  After the assault, Nancy B. saw
     appellant on a few occasions around the shelter.  Whenever she saw him she
8    would turn and walk away.  She told people at the soup kitchen about the
     assault and warned other women that appellant was dangerous.  While
9    Nancy B. knew Irene, she never told her about the assault by appellant.  At
     the time of trial, Nancy B. had not seen Irene for over three years and had not
10   spoken to her for over four years.

11        After the assault, Nancy B. moved across the river to another
     homeless encampment where a friend would be with her.  She was too
12   frightened to be in the other camp.  One day when her friend left to buy
     cigarettes, appellant appeared unexpectedly at the camp.  Nancy B. tried to
13   get up from the ground where she was sitting, but again appellant grabbed
     her hair and slammed her into the ground.  She tried to scream and fight
14   back, but appellant put his knee on her throat, preventing her from moving.

15        Appellant pulled out his penis and stuck in into her mouth.  He said
     something about "kissing daddy."  After about 10 to 15 minutes, appellant
16   ejaculated into Nancy B.'s mouth.  Then, he got up and left.  The assault left
     her with bruises on her throat.  Eventually, she reported this assault to a
17   police officer.  Officer Perry took her to the police station and she made a
     formal report.  She asked Officer Perry to not leave her on the street because
18   she thought she was going to die.  He took her to Dominican Hospital
     (Dominican) where she stayed for about two weeks.
19
          Dr. Paul Luther, a psychiatrist at Dominican, treated Nancy B.  He
20   diagnosed Nancy with a schizoaffective disorder and mixed substance abuse.
     He testified that schizoaffective disorder is an illness with both  mood and
21   thought disorders.  The mood disorders can be episodes of mania or
     depression.  In addition, people with this disorder also suffer from
22   schizophrenic symptoms, such as hearing voices, having delusions, and
     having disorganized thought processes.  While these episodes may last for
23   weeks, the individual is functional at other times.  Dr. Luther opined that being
     homeless and being sexually assaulted could exacerbate the situation.
24   Furthermore, people with this disorder are particularly vulnerable and easily
     victimized because their judgment is impaired.
25
          Nancy B. made reports of rape during two separate hospitalizations.
26   She was hospitalized from July 19 to July 28, 1997.  At that time, she
     reported that she had been raped about 10 days earlier.  During a second
27   hospitalization from August 20 to September 8, 1997, she told the doctor she
     had been raped following her release from the hospital.  Dr. Luther testified
28   that someone with Nancy B.'s mental condition could have trouble correctly

United States District Court
For the Northern District of California

4

placing a time when things happened because there is "a certain amount of confusion connected with the episode of their illness."

On August 16, 1997, Officer Mario Leon of the Santa Cruz Police Department responded to a call regarding an act of vandalism in Santa Cruz. He interviewed Nancy B. as a witness in the case. During the course of the interview, she mentioned someone named "Mike" had assaulted her two or three times. The first incident occurred two to three weeks prior to August 16, 1997. The second happened about three days after the first. The last incident occurred about a week after the second. She reported that the first assault was at the homeless campsite where Mike pushed her to the ground and forced her to engage in sexual intercourse with him. During the last incident, which took place just the night before the interview, Mike held her down and forced her to orally copulate him. She was unable to give any details of the second incident.

Officer David Perry recalled taking Nancy B. into custody on a 72-hour mental health hold pursuant to Welfare and Institutions Code section 5150[1] (section 5150) on August 19, 1997. She had been walking on some loose and jagged rocks and talking irrationally when he detained her as being a danger to herself. This was not the first time that he had detained her under section 5150. On August 3, 1997, when he first detained Nancy B., she had been walking in and out of traffic, banging on windows, and making irrational statements. Officer Perry had other contacts with Nancy B. when she was not disabled. On February 28, 1997 he arrested her for petty theft of cigarettes. At that time, she was acting rationally and did not appear mentally ill. On July 28, 1997, Nancy B. was rational and lucid when Officer Perry met with her at Dominican. He met with her in order to issue her a citation for theft of a motor vehicle. She understood the citation process and appeared to be mentally stable.

Santa Cruz Police Officer Nicholas Richards remembered that on July 19, 1997, he responded to a report of a reckless driver. When he arrived at the scene he saw Nancy B. sitting inside a car. She was rambling and talking very rapidly. When he asked her what was going on she said she was dying of AIDS and was starving to death. Officer Richards placed Nancy B. on a 72-hour mental health hold.

Two weeks later, Officer Michael Harms found Nancy B. wandering around in traffic. She was half-naked. She made a lot of irrational statements alleging that everyone was trying to cut off her breasts and face. Officer Harms took her to Dominican.

On August 19, 1997, Officer Harms had contact with Nancy B. when he saw her standing on some rocks. She was talking to herself. The officer took her to Dominican again. Since his beat was around the homeless shelter, Officer Harms saw Nancy B. frequently. Other than on the two

[1]Welfare and Institutions Code section 5150 states in pertinent part; "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, . . . may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."

United States District Court
For the Northern District of California

occasions when he took her to Dominican, the officer did not think that she acted differently than the other residents of Santa Cruz. Nancy B. never mentioned to Officer Harms that she had been raped. He was present when another officer issued a citation to her. At that time, the officer found her lucid and able to carry on a rational conversation.

*Nancy R.*

During trial Nancy R. testified about an incident in 1978. During the summer, in Yosemite National Park, a man sexually assaulted her. She worked in a gift shop in the park and the company provided its employees with housing. Nancy R. lived in a tent cabin. She had seen a man hanging around the gift store and he came into the store to buy cigarettes and beer.

On May 10, 1978, Nancy R. and some of the other employees were outside their tent cabins after work. They were talking and relaxing. The same man approached Nancy R.'s friend and asked if her friend would trade his beer for a joint of marijuana. Her friend said he did not have another beer to trade. Nancy R. recognized the man as one of the men the park employees called "park bums."

Nancy went into her tent cabin and the man followed her in. Nancy did not invite the man in and it made her feel very uncomfortable. The man began to talk about himself and wanted to show her a document that proved that he was part native American. He asked if Nancy R. lived alone in the cabin. She did not want the man inside her cabin and said she was going to make a phone call. The man followed her outside and walked away in the opposite direction. Nancy R. returned to her cabin.

Nancy R. left her cabin later that evening and returned after midnight. She was awakened by the sound of scratching at the door. She thought that it was bears looking for food. However, the same man appeared at the door of the cabin and asked Nancy R. to let him in. The man left after she ordered him to go away.

The man returned to Nancy R.'s cabin a few hours later. He cut a hole in the screen door of the cabin and entered. He held a knife to her neck and when she tried to pull away, he put his hand over her mouth and ordered her to take her shirt off. He touched Nancy R. all over her body. When she tried to resist he restrained her by holding her down. He prevented her from screaming by holding his hand over her mouth and threatened to hurt her if she yelled out. She was very frightened.

The man began to orally copulate Nancy R. He became more aggressive whenever she tried to resist. She hoped to escape from him by waiting for a chance when he was more relaxed. Nancy R. warned him that he could get into a lot of trouble for his conduct, but he replied that he did not care if he went to jail because he had been to jail before and would probably end up there again. The man's response made her feel even more frightened and anxious. At this time she realized she needed to escape.

Nancy R. noticed the knife the man was holding was a kitchen or cafeteria knife. She tried to convince the man that she needed to go to the bathroom. Initially he refused, however, he relented and said that she could go outside as long as he had hold of her arms. She tried to break away when

6

United States District Court

For the Northern District of California

she put on her bathrobe. The man restrained her and told her that was a mistake and made her lie on her back on the bed. He forced Nancy to put her hand on his penis. By this time it was almost 6:30 a.m. Nancy told the man that people would be up and would hear him. The man responded that he was planning to keep her in the cabin all day. When Nancy R. warned him that he could get into a lot of trouble, the man replied, "Oh, yeah, I can just see it now, 'Girl gets raped.'"

When the man relaxed his hold, she ran out of the cabin. She screamed and yelled for help. People were getting up at this point and a woman park employee came to Nancy R.'s aid. The man had apparently left his wallet in the tent cabin and he returned and demanded his wallet, which he said contained his Native American identity card. The police were notified and came and arrested the man.

Nancy R. was unable to positively identify appellant as the man who attacked her. However, on cross-examination, when asked "And the person in the courtroom you don't recognize?" She replied, "You know, vaguely, but it's been a long time." However, she did remember that she had learned that her assailant's name was Michael "Caita[.]" She described "Caita" as 5 feet 10 inches tall, with sandy color hair that was "shaggy." He was not clean-shaven. She thought he had a moustache.

In the rebuttal phase of the trial, Nancy R. testified that while she was working in the gift store, she had seen and talked to the person that assaulted her. On one occasion, he was purchasing some beer. He told Nancy R. that he was going to have a party because it was his birthday. He said he was 25 and was feeling old. This conversation occurred sometime after Nancy R. started working in the store in late April 1978, and before her assault on May 11, 1978.

Respondent's Ex. E (Unpublished Opinion of the California Court of Appeal, Sixth Appellate District, *People v. Cata*, No. H022414 (Jan. 24, 2003) at 2-12.[2]

Following a jury trial, petitioner was convicted of one count of sexual penetration by means of force, violence or duress (Cal. Penal Code § 289(a)(1)), two counts of sexual battery (Cal. Penal Code § 243.4(a)), false imprisonment (Cal. Penal Code § 236), rape by means of force, violence or duress (Cal. Penal Code § 261(a)(2)), and oral copulation by means of force, violence or duress (Cal. Penal Code § 288a(c)(2)). The jury found true the allegations that petitioner engaged in tying or binding his victim (Cal. Penal Code § 667.61(e)(6)), and committed specified sexual offenses against more than one victim (Cal. Penal Code § 667.61(e)(5)). The trial court sentenced petitioner to a total term of fifty

---

[2] All exhibits referenced in this order are those lodged by respondent in support of the answer to the petition, unless otherwise noted.

7

1   nine years and eight months-to-life in state prison.

2         Petitioner appealed his conviction to the California Court of Appeal which, in a

3   reasoned opinion, affirmed the judgment, but modified it to stay execution of sentence on

4   two counts pursuant to California Penal Code section 654, which prohibits multiple

5   punishments for the same act.  Petitioner filed a petition for review, which the California

6   Supreme Court denied.  Petitioner did not seek state habeas corpus review.

7         Petitioner filed the instant petition on July 2, 2003.  The court directed respondent to

8   show cause why the writ should not be granted with respect to the following claims: (1) the

9   admission of evidence of petitioner's prior sexual assault violated his constitutional right to

10  confrontation, (2) trial counsel was ineffective for failing to adequately object to a statement

11  made by the victim of the prior assault, (3) admission of evidence of the prior assault and

12  the trial court's instruction to the jury on how to consider the evidence violated petitioner's

13  constitutional right to due process, and (4) joinder of the counts relating to the two victims

14  deprived petitioner of a fair trial.

15                              **STANDARD OF REVIEW**

16        A district court may not grant a petition challenging a state conviction or sentence on

17  the basis of a claim that was reviewed on the merits in state court unless the state court's

18  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

19  unreasonable application of, clearly established Federal law, as determined by the

20  Supreme Court of the United States; or (2) resulted in a decision that was based on an

21  unreasonable determination of the facts in light of the evidence presented in the State court

22  proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

23  mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000),

24  while the second prong applies to decisions based on factual determinations, *Miller-El v.*

25  *Cockrell*, 537 U.S. 322, 340 (2003).

26        A state court decision is "contrary to" Supreme Court authority, that is, falls under the

27  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

28  reached by [the Supreme] Court on a question of law or if the state court decides a case

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

2   *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of"

3   Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

4   identifies the governing legal principle from the Supreme Court's decisions but

5   "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

6   federal court on habeas review may not issue the writ "simply because that court concludes

7   in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

9   be "objectively unreasonable" to support granting the writ. *Id.* at 409.

10      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

11   determination will not be overturned on factual grounds unless objectively unreasonable in

12   light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340;

13   *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Section 2254(d)(2) applies

14   to intrinsic review of a state court's process, or situations in which the petitioner challenges

15   the state court's findings based entirely on the state court record. *Taylor v. Maddox*, 366

16   F.3d 992, 999-1000 (9th Cir. 2004).  The relevant question under § 2254(d)(2) is whether

17   an appellate panel, applying the normal standards of appellate review, could reasonably

18   conclude that the state court findings are supported by the record. *Lambert v. Blodgett*,

19   393 F.3d 943, 978 (9th Cir. 2004).

20      The state court decision to which 2254(d) applies is the "last reasoned decision" of

21   the state court, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*,

22   423 F.3d 1085, 1091-92 (9th Cir. 2005).

23      If constitutional error is found, habeas relief is warranted only if the error had a

24   "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v.

25   Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

26   (1993)).

27

28

**DISCUSSION**

*A.     Admission of Evidence of Petitioner's Prior Assault on Nancy R. in 1978*

During in limine motions, the prosecutor moved to introduce evidence of two prior sexual assaults by petitioner.  Over objection by defense counsel, the trial court ruled that the evidence was admissible.  At trial, the prosecutor introduced evidence of only one of the prior incidents, the 1978 sexual assault on Nancy R. in Yosemite.  The prosecutor called Nancy R. to testify regarding the assault.  Because Nancy R. was unable to positively identify petitioner as the person that sexually assaulted her, the prosecutor sought to introduce evidence of petitioner's Federal Bureau of Investigation rap sheet (hereinafter federal rap sheet) to link petitioner to the assault.  The trial court allowed admission of the rap sheet.

On appeal, petitioner raised four challenges relating to the admission of this evidence: (1) that its admission was unduly prejudicial, and the state evidentiary code section which allowed for its admission violates due process, (2) that the trial court's instruction to the jury on how to consider the evidence violated due process, (3) that use of the federal rap sheet to link petitioner to the prior assault violated state law and petitioner's right to confrontation, and (4) that counsel was ineffective for failing to object to hearsay testimony given by Nancy R. on direct examination.  The court of appeal rejected each of petitioner's claims.

In the instant petition, petitioner argues that the aforementioned errors violated his federal constitutional rights to due process, confrontation, and the effective assistance of counsel.  The court discusses each claim in turn, below.

*1.     Violation of Due Process*

*a.     Background*

Petitioner argues that the admission of his prior sexual misconduct violated his constitutional right to due process.

During in limine motions, the prosecutor moved to introduce into evidence petitioner's two prior sexual assaults pursuant to California Evidence Code sections 1108

10

United States District Court
For the Northern District of California

1   and 1101.  Evidence Code section 1108 permits the admission, in a sex offense case, of

2   the defendant's other crimes or bad acts for the purpose of showing a propensity to commit

3   sexual offenses.  The law creates an exception to Evidence Code section 1101(a), which

4   states that "evidence of a person's character or a trait of his or her character is inadmissible

5   when offered to prove his or her conduct on a specified occasion."  Section 1108(a)

6   provides that "[i]n a criminal action in which the defendant is accused of a sexual offense,

7   evidence of the defendant's commission of another sexual offense or offenses is not made

8   inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

9   California Evidence Code section 352 permits courts to "exclude evidence if the probative

10  value is substantially outweighed by the probability that its admission will (a) necessitate

11  undue consumption of time or (b) create substantial danger of undue prejudice, of

12  confusing the issues, or of misleading the jury."

13         The first prior assault the prosecutor sought to admit was the sexual assault on

14  Nancy R. in 1978 that resulted in a six-year federal prison term.  CT 94-96.  The second

15  prior assault occurred in 1986, when petitioner sexually assaulted Francis K. in Colorado.

16  CT 96.  Petitioner pleaded guilty to assault in the third degree and was sentenced to

17  eighteen months in the Arapahoe County Jail.  CT 96-97.  Following argument on the

18  matter, the trial court ruled as follows:

19         Okay.  So here's what I think I'm going to do.  This is the one motion I
       took home and read here yesterday and read at home and reread early this
20     morning.  And that's motion in limine number two, and this refers to whether
       or not the court should allow in the testimony of the two victims, one Nancy R.
21     in 1978 and one Francis K. for Christmas day 1986, and it appears to me that
       they should, both cases.  The evidence in both cases should be allowed in
22     under both 1101(b) and 1108, or in the alternative, and I've gone through the
       352 weighing here, and the charges in the present case with regard to Irene
23     S. and Nancy B. -- we have got two Nancies here, Nancy B., and is it Nancy .
       . . . Nancy R.  So Nancy B. is the alleged victim in counts – they're two of the
24     counts in the information on file with the court.

25         So it would seem to me that there is no danger of prejudice,
       particularly because the allegations of this case are approximately the same.
26     I mean it's, it's not like someone being tried for a small offense and then you
       threw against them a big, prior conduct.  For instance, if he was charged with
27     fondling or something in this case and then you brought in a  22-year-old
       rape, you might have that point.  But here approximately the same results
28     occurred in all four cases, that he gratified himself sexually, or went a long

11

United States District Court
For the Northern District of California

1    way towards it.

2         Also, it appears in all four cases he used force of some sort or another
3    and came at each of the four victims in approximately, although not the exact,
     same way both – that is in 1999, '97, '86 and '78.  Those are referring to
     years.
4
5         My 352 weighing, although it's remote in time – I am somewhat
     surprised to see that the authorities do allow one to go back 20 years or
6    more, and since . . . there's not a lot of distinctions between those four
     events, it's pretty much the same thing and the parallels are very close.
7    RT 35-37.

8         At trial, the prosecutor introduced evidence of only the prior 1978 sexual assault on

9    Nancy R.

10        On appeal, petitioner argued that the trial court abused its discretion in admitting the

11   evidence under Evidence Code section 352 because its prejudicial effect outweighed its

12   probative value.  He also argued that Evidence Code section 1108 violated his federal

13   constitutional right to due process because it allowed the admission of other crimes

14   evidence to show the propensity of a defendant to commit a charged offense.  The

15   California Court of Appeal rejected both of these contentions.

16        With respect to petitioner's challenge under Evidence Code section 352, the

17   appellate court held that the trial court had not abused its discretion, finding as follows:

18        The probative value of Nancy R.'s testimony was its tendency to
     establish appellant's propensity to employ force and threats against women in
19   order to obtain sexual gratification.  The probative value of the prior acts
     evidence was enhanced by the fact that its source was "independent of the
20   evidence of the charged offense[s]." (*People v. Ewoldt* [(1994) 7 Cal.4th 380]
     [ ] at p. 404.)  Furthermore, since the assault on Nancy R. occurred in 1978,
21   no risk existed that the evidence concerning this offense could have been
     influenced by knowledge of the charged crimes.  (*Ibid.*)
22
          Moreover, where the evidence of the sexual assault on Nancy R. was
23   "no stronger and no more inflammatory than the testimony concerning the
     charged offenses," the "potential for prejudice" was decreased because it was
24   "unlikely" the jury would have disbelieved the victim's testimony but
     nonetheless have convicted appellant because of the other offense or that the
25   jury's passions would have been "inflamed" by the prior acts.  (*People v.
     Ewoldt, supra,* 7 Cal.4th at p. 405.)
26
          Considering all the circumstances of this case, whether the evidence
27   was admitted under Evidence Code section 1101 or Evidence Code section
     1108, [footnote omitted] it cannot be said that the trial court's exercise of
28   discretion under Evidence Code section 352 in admitting Nancy R.'s

                                        12

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

testimony exceeded "the bounds of reason."  (*People v. Stewart*, [(1985) 171 Cal.App.3d 59] [ ] at p. 65.)

Ex. E. at 20-21.

The court also rejected petitioner's due process challenge, citing to *People v. Falsetta*, 21 Cal.4th 903 (1999), in which the California Supreme Court upheld the constitutionality of Evidence Code section 1108.  *See id.* at 915-22.

In his federal habeas corpus petition, petitioner challenges the constitutionality of Evidence Code section 1108 on its face, and also as applied by the trial court in his case.

>     *b.*      *Applicable Federal Law*

A state's criminal law (such as an evidence law pertaining to criminal trials) does not violate the Fourteenth Amendment's Due Process Clause "unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (citation omitted).  The defendant bears the burden of showing that the principle or procedure violated by the rule is fundamental.  *Id.* at 47.  Moreover, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See id.*  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated.  *See id.*  The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

1

             *c.*    *Analysis*

2          No published federal appellate court opinion has yet reached the question whether

3  California Evidence Code section 1108 meets the requirements of federal due process. *Cf.*

4  *Schroeder v. Tilton*, No. 06-15391, slip op. 7981, 7989-90 (9th Cir. Jul. 3, 2007) (holding

5  that section 1108 does not violate the Ex Post Facto Clause). However, section 1108 is

6  analogous to Federal Rule of Evidence 414, which governs the admission of prior conduct

7  evidence in federal criminal trials concerning child molestation. The Ninth Circuit has

8  rejected due process and equal protection challenges to Rule 414, and its reasoning guides

9  this court's consideration of the very similar California law. *See United States v. LeMay*,

10  260 F.3d 1018, 1024, 1030 (9th Cir. 2001), *cert. denied*, 534 U.S. 1166 (2002). Rule 414

11  states that "evidence of the defendant's commission of another offense or offenses of child

12  molestation is admissible, and may be considered for its bearing on any matter to which it

13  is relevant." Rule 414 does not violate due process because Rule 403 (the federal analog

14  to California Evidence Code section 352) functions as a filter, resulting in the exclusion of

15  evidence that is so prejudicial as to deprive the defendant of his right to a fair trial. *Id.* at

16  1026. In other words, the "application of Rule 403 to Rule 414 evidence eliminates the due

17  process concerns posed by Rule 414." *Id.* at 1027 (quoting *United States v. Castillo*, 140

18  F.3d 874, 881 (10th Cir. 1998)).

19          California Evidence Code section 1108 functions in a similar fashion to Federal Rule

20  of Evidence 414. Section 1108 allows for the introduction of evidence of prior sex offenses

21  committed by a defendant accused of a sex offense and is subject to section 352, which

22  excludes unduly prejudicial evidence. Like Rule 414, section 1108 does not pose a due

23  process concern because the section 352 filter does not allow the admission of section

24  1108 evidence which is so prejudicial as to preclude the right to a fair trial guaranteed by

25  the Due Process Clause. Petitioner has not shown "that the traditional ban on propensity

26  evidence involves a 'fundamental conception of justice'" which is violated by section 1108.

27  *See id.* at 1025. He thus has not shown that section 1108, which allows propensity

28  evidence in the limited area of sex offense cases, on its face violates due process.

**United States District Court**
For the Northern District of California

1    Section 1108 also did not violate due process as it was applied in petitioner's case.

2  The prior assault was relevant because of its similarity to the assaults against Irene S. and

3  Nancy B.  In each case petitioner first initiated conversation and then used physical force

4  and threats against women in isolated locations to obtain sexual gratification.  The

5  probative value of the prior assault was especially strong because Nancy R. had no

6  connection in time or place to the other victims.  Moreover, as noted by the California Court

7  of Appeal, because the testimony regarding the prior assault was no more inflammatory

8  than the testimony regarding the charged offenses, it was unlikely that the jury would have

9  convicted petitioner because it believed Nancy R. but disbelieved Irene S. and Nancy B.

10  Thus, the prejudicial impact of the evidence did not outweigh its probative value.  In short,

11  the introduction of the prior assault fulfilled the basic purpose of section 1108 by giving the

12  jury more to assess than the relative credibility of victim and accuser.  *See Falsetta*, 21 Cal.

13  4th at 915 ("[T]he Legislature's principal justification for adopting section 1108 was a

14  practical one: By their very nature, sex crimes are usually committed in seclusion without

15  third party witnesses or substantial corroborating evidence.")

16    Finally, petitioner has not shown that the court of appeal's rejection of his due

17  process claim was contrary to or an unreasonable application of "clearly established

18  Federal law, as determined by the Supreme Court of the United States."  28 U.S.C.

19  § 2254(d)(1).  As the Ninth Circuit has recognized, there is not much in the way of clearly

20  established law on the question of the admission of propensity evidence.

21        [T]he Supreme Court has never expressly held that it violates due
     process to admit other crimes evidence for the purpose of showing conduct in
22    conformity therewith, or that it violates due process to admit other crimes
     evidence for other purposes without an instruction limiting the jury's
23    consideration of the evidence to such purposes.  Indeed, the Supreme Court
     has expressly declined to answer these questions, *see* [*Estelle v. McGuire*,
24    502 U.S. 62, 75 n.5 (1991)] (["]Because we do not reach the issue, we
     express no opinion on whether a state law would violate the Due Process
25    Clause if it permitted the use of [']prior crimes['] evidence to show propensity
     to commit a charged crime["]).
26
     *Garceau v. Woodford*, 275 F.3d 769, 774-75 (9th Cir. 2001), *reversed on other grounds*,
27
     538 U.S. 202 (2003).
28

**United States District Court**
For the Northern District of California

1    The state court's rejection of petitioner's claim was not contrary to, or an

2  unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or

3  based on an unreasonable determination of the facts in light of the evidence presented in

4  the state court proceedings, *id.* § 2254(d)(2).  Accordingly, this claim for habeas corpus

5  relief is denied.

6        *2.    Instructional Error*

7            *a.    Background*

8        Petitioner challenges the constitutional validity of the trial court's instruction informing

9  the jury how to consider the evidence of the prior assault.

10      The trial court, quoting the 1999 revision of California standard jury instruction

11  (CALJIC) No. 2.50.01, instructed the jury as follows:

12          Evidence has been introduced for the purpose of showing that the
        defendant engaged in a sexual offense on one or more occasions other than
13      that charged in the case.  "Sexual offense" means a crime under the laws . . .
        of a state or of the United States that involves the following: Contact without
14      consent between any part of the defendant's body and the genitals of another
        person.

15          If you find that the defendant committed a prior sexual offense, you
16      may, but are not required, to infer that the defendant had a disposition to
        commit the same or similar type sexual offenses. If you find that the
17      defendant had this disposition, you may, but are not required, to infer that the
        defendant had a disposition to commit the same or similar type sexual
18      offense.

19          If you find that the defendant had this disposition, you may, but are not
20      required, to infer that he was likely to commit and did commit the crime or
        crimes of which he is accused in this trial.  However, if you find by a
21      preponderance of the evidence that the defendant committed a prior sexual
        offense, that is not sufficient by itself to prove beyond a reasonable doubt that
22      he committed the charged crimes in this case.  The weight and significance of
        the evidence, if any, are for you to decide.  Unless you are otherwise
23      instructed, you must not consider this evidence for any other purpose.

24  RT 1870.  The trial court also gave standard California instructions on the definition of

25  "preponderance of the evidence" and "reasonable doubt," RT 1870-71, 1874, and

26  instructed the jury that it must consider all of the instructions as a whole and in light of all of

27  the other instructions, RT 1856.

28      On appeal, petitioner argued that the instruction permitted the jury to find that he

**United States District Court**
For the Northern District of California

was guilty based on propensity evidence alone, thereby allowing him to be found guilty on

proof less than beyond a reasonable doubt, in violation of due process.  The court of

appeal rejected petitioner's challenge, relying on the California Supreme Court's opinion in

*Falsetta, supra,* which found that the 1999 revised version of CALJIC 2.50.01 properly

instructed the jury that it could consider the evidence to find that the defendant had a

propensity to commit such crimes, but that it could not convict him for the current crimes

solely in reliance on the evidence that he committed prior sex offenses. 21 Cal. 4th at 922-

23.

The court also looked to the trial court's instructions as a whole, and concluded:

> Reading the instructions as whole, it is not reasonably likely that the
> jury would have been misled into believing it could dispense with these
> instructions and leap from a finding that appellant committed the prior sexual
> offenses by a standard higher than a preponderance to the conclusion that he
> had committed the same offenses against both Nancy B. and Irene S.  To so
> interpret the language appellant attacks would be to ignore the clear meaning
> of the other instructions given, as well as the specific admonition in CALJIC
> No. 2.50.01 that prior sexual offenses were insufficient alone to prove beyond
> a reasonable doubt that appellant committed the charged offenses.  We
> presume that the jury followed the instructions given, not that it ignored them.
> (See, e.g., *People v. Horton* (1995) 11 Cal.4th 1068, 1121.)  We conclude
> that CALJIC No. 2.50.01 as given did not result in appellant being convicted
> of the current charges based solely on proof beyond a reasonable doubt that
> appellant committed the prior sexual offense to which Nancy R. testified.

Ex. E at 27.

In the instant petition, petitioner similarly argues that CALJIC 2.50.01

unconstitutionally diluted the burden of proof necessary to find him guilty of the charged

offenses.

*b.    Applicable Federal Law*

A challenge to a jury instruction solely as an error under state law does not state a

claim cognizable in federal habeas corpus proceedings.  *See Estelle*, 502 U.S. at 71-72.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

the ailing instruction by itself so infected the entire trial that the resulting conviction violates

due process.  *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also*

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely

United States District Court

For the Northern District of California

1   that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

2   violated some right which was guaranteed to the defendant by the Fourteenth

3   Amendment.") (quoting *Cupp*, 414 U.S. at 146).  The instruction "may not be judged in

4   artificial isolation," but must be considered in the context of the instructions as a whole and

5   the trial record.  *See Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).

6          The Due Process Clause of the Fourteenth Amendment protects the accused

7   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

8   constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364

9   (1970).  This constitutional principle prohibits the state from using evidentiary presumptions

10  in a jury charge that have the effect of relieving the state of its burden of persuasion beyond

11  a reasonable doubt of every essential element of a crime.  *See Yates v. Evatt*, 500 U.S.

12  391, 400-03 (1991).

13              *c.   Analysis*

14         In *Gibson v. Ortiz*, 387 F.3d 812, 821-22 (9th Cir. 2004), the Ninth Circuit found that

15  instructing the jury with the pre-1999 version of CALJIC 2.50.01 and its companion

16  instruction CALJIC 2.50.1 violates a defendant's right not to be found guilty except upon

17  proof beyond a reasonable doubt, because that version of 2.50.01 says that the jury may,

18  but is not required to, infer from evidence of previous offenses that the defendant

19  committed the crime with which he is charged, and 2.50.1 says that such previous offenses

20  need be proved only by a preponderance of the evidence, not beyond a reasonable doubt.

21  Together, the instructions allow conviction by a preponderance, rather than requiring proof

22  beyond a reasonable doubt.  *Id.* at 822-25.

23         In this case, however, petitioner was instructed with the 1999 revision of 2.50.01,

24  which added the following language: "However, if you find by a preponderance of the

25  evidence that the defendant committed a prior sexual offense, that is not sufficient by itself

26  to prove beyond a reasonable doubt that he committed the charged crimes in this case.

27  The weight and significance of the evidence, if any, are for you to decide."  RT 1870.  After

28  the opinion of the California Court of Appeal was issued in petitioner's case, the California

18

United States District Court

For the Northern District of California

1  Supreme Court held in *People v. Reliford*, 29 Cal. 4th 1007 (2003), that the revised version

2  of CALJIC 2.50.01 does not dilute the prosecution's burden of proof.  *See id.* at 1013-14,

3  1016.

4         This court finds that the revised instruction addresses the *Gibson* court's concern

5  that the pre-revision instructions provided "two routes of conviction, one by a

6  constitutionally sufficient standard and one by a constitutionally deficient one."  387 F.3d at

7  823.  When it is impossible to know whether a jury used the impermissible legal theory or

8  the one which meets constitutional requirements, the unconstitutionality of one of the routes

9  requires that the conviction be set aside.  *Id.* at 825.  In petitioner's case, however, the

10 constitutionally deficient route was blocked off – the court instructed the jury in unequivocal

11 words that it could *not* find petitioner guilty beyond a reasonable doubt just because it had

12 found by a preponderance of the evidence that he committed prior bad acts.  *See McGee v.*

13 *Knowles,* 218 Fed. Appx. 584, *1 (9th Cir. 2007) ("The revised version of CALJIC 2.50.01

14 expressly instructs the jury that a preponderance of the evidence finding that McGee

15 committed a prior sexual offense is not sufficient to prove the charged offenses beyond a

16 reasonable doubt.")  The jury is presumed to have followed the instructions, *Weeks v.*

17 *Angelone*, 528 U.S. 225, 234 (2000), and in so doing it could not have taken the

18 constitutionally impermissible route to a guilty verdict.  Petitioner's due process rights were

19 not violated.

20        The state court's rejection of petitioner's claim was not contrary to, or an

21 unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1).

22 Accordingly, this claim for habeas corpus relief is denied.

23        3.    *Violation of Right to Confrontation*

24              a.    *Background*

25        Petitioner claims that the trial court erroneously allowed the admission of his federal

26 rap sheet, which the prosecutor used to prove that petitioner was the person who assaulted

27 Nancy R. in 1978.

28        On the stand, Nancy R. testified that she was sexually assaulted by a man when she

19

1    worked at Yosemite National Park during the summer of 1978.  RT 908-24.  She learned

2    afterwards that the man's name was "Michael Caita."  RT 917.  On direct examination, the

3    prosecutor asked Nancy R. if she could recognize her assailant:

4        Prosecutor:   Do you see him in the courtroom today?

5        Nancy R:     Well, it's been a long time, so I don't really
6                          recognize him from –

7        Prosecutor:   Do you recall – looking back at the person, do you
                        recall how tall that person was that came into your
8                          tent?

9        Nancy R:     You know, maybe 5-10 or so, not – not –
                      extraordinarily tall, as I recall.

10       Prosecutor:   Do you recall the color of hair?

11       Nancy R:     Sandy hair.  He had kind of long, shaggy, sandy
12                         hair.

13       Prosecutor:   Well, clean shaven, not clean shaven?

14       Nancy R:     I don't think that he was clean shaven.  As far as I
                      recall, at least a moustache.

15   RT 917-18.

16         On cross-examination, defense counsel again asked Nancy R. if she recognized

17   petitioner.  RT 924.  Nancy R. responded, "You know, vaguely, but it's been a very long

18   time."  RT 924.

19         The prosecutor then moved the court, out of the presence of the jury, to admit

20   petitioner's federal rap sheet to link him to the 1978 assault on Nancy R.  Stating her belief

21   that Nancy R.'s testimony alone was sufficient to link petitioner to the 1978 assault, the

22   prosecutor sought to strengthen the connection by presenting evidence of petitioner's

23   California rap sheet for a 1997 petty theft arrest which, in turn, would connect petitioner

24   through identifying information to a federal rap sheet, which identified petitioner as the

25   person who committed the assault in 1978.  RT 1251-54.  After holding a California

26   Evidence Code section 402 hearing to determine the reliability of the evidence, the trial

27   court concluded that the federal rap sheet could come in under the official records

28   exception to the hearsay rule, but agreed to sanitize the evidence so that the witnesses

United States District Court

For the Northern District of California

1 would testify about a "contact" with petitioner without referring to a petty theft, and would

2 refer to "official records" instead of rap sheets.  RT 1267, 1343, 1405.

3      On appeal, petitioner conceded that the prosecutor had made a sufficient

4 foundational showing that the California rap sheet was admissible as an official record, but

5 argued that the foundational showing for admission of the federal rap sheet was

6 insufficient.  The court of appeal rejected this contention, finding that defense counsel had

7 failed to show that the federal rap sheet did not meet state evidentiary requirements for

8 admission as a public record or that it was not trustworthy.  Ex. E at 17.  The court also

9 noted that, during opening statements, defense counsel had admitted that petitioner

10 suffered a conviction as the result of an incident that occurred in Yosemite twenty two years

11 earlier.  Based on this record, the court found no abuse of discretion by the trial court in

12 admitting the federal rap sheet.  Ex. E at 18.

13      In the instant petition, petitioner argues that admission of the federal rap sheet

14 violated state law and his federal constitutional right to confrontation.

15           *b.      Applicable Federal Law*

16      As discussed above, the admission of evidence is not subject to federal habeas

17 review unless a specific constitutional guarantee is violated or the error is of such

18 magnitude that the result is a denial of due process.  *Henry*, 197 F.3d  at 1031.  The failure

19 to comply with state rules of evidence is neither a necessary nor a sufficient basis for

20 granting federal habeas relief on due process grounds.  *See id.*  Even where it appears that

21 evidence was erroneously admitted, a federal court will interfere only if it appears that its

22 admission violated fundamental due process and the right to a fair trial.  *Id.*

23      Out-of-court statements constitute hearsay when offered in evidence to prove the

24 truth of the matter asserted.  *Anderson v. United States*, 417 U.S. 211, 219 (1974).  The

25 Confrontation Clause does not necessarily bar the admission of hearsay statements, but it

26 may prohibit introducing evidence that otherwise would be admissible under a hearsay

27 exception.  *See Idaho v. Wright*, 497 U.S. 805, 813, 814 (1990).   At the time petitioner's

28 conviction became final, *Ohio v. Roberts*, 448 U.S. 56 (1980), and its progeny, *Idaho v.*

United States District Court

For the Northern District of California

1   *Wright,* 497 U.S. 805 (1990), governed the admissibility of hearsay evidence in a criminal

2   case under the Confrontation Clause.[3]   *Roberts* held that a hearsay statement is

3   presumptively inadmissible against a criminal defendant unless the declarant is unavailable

4   and the statement bears "adequate indicia of reliability" – that is, the statement falls within a

5   "firmly rooted hearsay exception" or contains "particularized guarantees of trustworthiness."

6   *Roberts,* 448 U.S. at 66 (internal quotation marks omitted); *see Wright,* 497 U.S. at 815-16.

7          Particularized guarantees of trustworthiness may be present if the totality of

8   circumstances surrounding the statement itself – without regard to corroborating evidence

9   separate from the statement – indicate that the statement is "so trustworthy that adversarial

10  testing would add little to its reliability." *Id.* at 821.  "Courts have considerable leeway in

11  their consideration of appropriate factors." *Id.; see Whelchel v. Washington*, 232 F.3d 1197,

12  1204 (9th Cir.2000) ("There is no mechanical test for determining reliability nor a prescribed

13  list of reliability elements" in the Confrontation Clause analysis).  What the Supreme Court

14  has "clearly established" is that the relevant circumstances in the Confrontation Clause

15  analysis are limited to "those that surround the making of the statement and that render the

16  declarant particularly worthy of belief."  *Parle v. Runnels,* 387 F.3d 1030, 1040 (9th Cir.

17  2004)

18         Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

19  *Nielsen,* 371 F.3d 574, 581 (9th Cir. 2004).  For purposes of federal habeas corpus review,

20  the standard applicable to violations of the Confrontation Clause is whether the

21  inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v.*

22  *Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619,

23  _____

24        [3]After petitioner's conviction became final, the United States Supreme Court handed
      down its opinion in *Crawford v. Washington*, 541 U.S. 36 (2004), which revised the
25    standard for assessing Confrontation Clause claims pertaining to the admissibility of
      "testimonial hearsay" statements.  *Crawford* is not applicable to petitioner's claim, however,
26    because it announces a "new rule" that does not come within the "watershed rules"
      exception to non-retroactivity.  *See Whorton v. Bockting*, 127 S. Ct. at 1184 (2007)
27    (applying *Teague v. Lane*, 489 U.S. 288, 310-316 (1989)).  Thus, *Crawford* does not apply
      retroactively on collateral attack.  *Id.*  Petitioner's Confrontation Clause claim therefore must
28    be analyzed under *Roberts* and *Wright*.

1   637 (1993)).

2            *c.      Analysis*

3        Petitioner's claim that the trial court erred when it determined that the federal rap

4   sheet met the foundational requirements of state evidentiary law is not cognizable on

5   federal habeas corpus.  Rather, the only question for this court is whether admission of the

6   federal rap sheet – irrespective of the correctness of the trial court's ruling under state law

7   – violated his rights to confrontation or due process.

8        Here, the California Court of Appeal concluded that the trial court had not erred by

9   relying upon federal statutes and implementing regulations to find that the federal rap sheet

10  satisfied the "official record" requirement.  Ex. E. at 16-17.  In addition, the court of appeal

11  found that,

12            . . . the trustworthiness of the federal rap sheet was enhanced by
         evidence that the federal rap sheet had the same identifying information as
13       the California rap sheet, except for a difference in height.  Appellant's name,
         weight, place of birth and other identifying information was the same.
14       Additionally, the federal rap sheet was located using an identifying number
         located on appellant's California rap sheet.  Furthermore, Inspector Flores
15       testified that fingerprints are used for verification in the federal and state
         system.
16
    Ex. E at 17-18.
17
         The court also considered the fact that, consistent with the federal rap sheet, during
18
    opening argument defense counsel made the following statement:
19
             You're going to hear also regarding another thing that we don't dispute.
20       We agree that, yes, Mr. Cata did suffer a conviction 22 years ago in federal
         court regarding allegations that occurred in Yosemite.  But what you're going
21       to hear regarding that conviction 22 years ago, you're going to find out, has
         absolutely nothing to do with the facts of these cases.
22
    Ex. E at 18.
23
         The court of appeal's consideration of these factors to find that the federal rap sheet
24
    was properly admitted was not contrary to or an unreasonable application of Supreme
25
    Court precedent, which holds that there is no mechanical test for determining the
26
    particularized guarantee of trustworthiness of a hearsay statement, and that courts must
27
    look to the totality of the circumstances.  *See Parle,* 387 F.3d 1039 (discussing Supreme
28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   Court cases). Nor were the court's findings of fact objectively unreasonable in light of the

2   evidence presented to the trial court. *See id.* at 1040 (applying 28 U.S.C. § 2254(d)(2)).

3       Moreover, even if the federal rap sheet was erroneously admitted, the error was

4   harmless. Even without the federal rap sheet, Nancy R.'s testimony independently linked

5   petitioner to the 1978 assault. Although she could not positively identify petitioner as the

6   assailant, she nevertheless testified that, after such a long period of time, she still "vaguely"

7   recognized him as the person who attacked her. Also, her descriptions of the assailant,

8   which matched petitioner's description, were based not only on the assault, but also on her

9   contacts with petitioner in the gift shop prior thereto. And she knew that her assailant had

10  just turned twenty five years old when he attacked her, which coincided with petitioner's

11  birthday (as established by the California rap sheet), and that his name was Michael

12  "Caita."

13      Finally, and decisively for purposes of federal habeas corpus review, the error did

14  not have a substantial and injurious effect or influence in determining the jury's verdict,

15  *Brecht*, 507 U.S. at 638, because the evidence that petitioner committed the charged

16  crimes against Irene S. and Nancy B. was strong. *See Sims v. Brown*, 425 F.3d 560, 571

17  (9th Cir. 2005) (federal courts may assess the strength of the state's evidence apart from

18  the erroneously admitted evidence to determine whether the error was harmless.) Irene

19  S.'s identification of petitioner as her assailant was corroborated by DNA evidence of

20  petitioner's semen on her face; Nancy B. identified petitioner as "Mike;" both women

21  identified petitioner as wearing a cast on his foot, and both women were homeless and

22  attacked in similarly violent ways under similar circumstances.

23      The state court's rejection of petitioner's claim was not contrary to, or an

24  unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or

25  based on an unreasonable determination of the facts in light of the evidence presented in

26  the state court proceedings, *id.* § 2254(d)(2). Accordingly, this claim for habeas corpus

27  relief is denied.

28      *4.    Ineffective Assistance of Counsel*

24

1

*a.    Background*

2        During the prosecutor's direct examination of Nancy R. about the events that

3    occurred in Yosemite in 1978, the following colloquy took place:

4        Prosecutor:    Do you remember the person's name that did this
                        to you?

5
        Nancy R:       Well, I learned afterwards that his name is Michael
6                      Caita (phonetic).

7    RT 917.

8        Petitioner's counsel did not object to Nancy R.'s answer.  On appeal, petitioner

9    argued that this amounted to ineffective assistance of counsel, because the answer directly

10   linked petitioner to the prior assault even though Nancy R. had not been able to positively

11   identify petitioner in court.

12       The court of appeal found no merit to petitioner's claim.  Citing to state law cases

13   which relied upon *Strickland v. Washington*, 466 U.S. 668 (1984), the court found as

14   follows:

15           In this case, even if counsel had objected, the prosecution was still
         able to show appellant's connection to the 1978 assault on Nancy R. through
16       the state and federal rap sheets.  Since appellant has failed to show that he
         was prejudiced by the admission of Nancy R.'s statement, his claim of
17       ineffective assistance of counsel fails.

18   Ex. E at 19.

19       In the instant petition, petitioner similarly claims that counsel's failure to object

20   violated his Sixth Amendment right to the effective assistance of counsel.

21           *b.    Applicable Federal Law*

22       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

23   Sixth Amendment right to counsel, which guarantees not only assistance, but effective

24   assistance of counsel.  *Strickland*, 466 U.S. at 686.  The benchmark for judging any claim

25   of ineffectiveness must be whether counsel's conduct so undermined the proper functioning

26   of the adversarial process that the trial cannot be relied upon as having produced a just

27   result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a

28   petitioner must make two separate showings.

25

United States District Court

For the Northern District of California

1    First, he must establish that counsel's performance was deficient, that is, that it fell

2    below an "objective standard of reasonableness" under prevailing professional norms.  *Id.*

3    at 687-88.  Judicial scrutiny of counsel's performance must be highly deferential, and a

4    court must indulge a strong presumption that counsel's conduct falls within the wide range

5    of reasonable professional assistance.  *Id.* at 689.

6    Second, he must establish that he was prejudiced by counsel's deficient

7    performance, that is, that "there is a reasonable probability that, but for counsel's

8    unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

9    A reasonable probability is a probability sufficient to undermine confidence in the outcome.

10   *Id.*  Where the defendant is challenging his conviction, the appropriate question is "'whether

11   there is a reasonable probability that, absent the errors, the factfinder would have had a

12   reasonable doubt respecting guilt.'"  *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002)

13   (quoting *Strickland*, 466 U.S. at 695).   A court need not determine whether counsel's

14   performance was deficient before examining the prejudice suffered by the defendant as the

15   result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697.

16   The *Strickland* framework for analyzing ineffective assistance of counsel claims is

17   considered to be "clearly established Federal law, as determined by the Supreme Court of

18   the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Williams (Terry)*,

19   529 U.S. at 404-408.

20          *c.    Analysis*

21   The court of appeal's rejection of petitioner's ineffective assistance of counsel claim

22   was not contrary to or an unreasonable application of *Strickland*.  Even if this court

23   assumes, without deciding, that counsel's performance was deficient, petitioner did not as a

24   result suffer prejudice sufficient to warrant habeas corpus relief.

25   Nancy R.'s testimony linked petitioner to her assault even without her statement that

26   she had learned, after the fact, that the name of her assailant was Michael "Caita."  As

27   discussed above, Nancy R. still "vaguely" recognized petitioner as the person who had

28   attacked her twenty two years earlier, her descriptions of the assailant matched petitioner's

United States District Court

For the Northern District of California

1   description, she knew petitioner's age at the time of the assault, which coincided with

2   petitioner's birthday, and the federal rap sheet (which this court has found was properly

3   admitted), conclusively identified petitioner as the assailant.

4         Admission of Nancy R.'s statement also does not create "a reasonable probability

5   that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."

6   *Luna*, 306 F.3d at 961 (internal quotation marks omitted).  Again, as discussed in detail

7   above, the evidence that petitioner committed the charged crimes against Irene S. and

8   Nancy B. was strong.

9         The state court's rejection of petitioner's claim was not contrary to, or an

10   unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1).

11   Accordingly, this claim for habeas corpus relief is denied.

12         4.      *Joinder of the Charged Offenses*

13              a.      *Background*

14         Prior to trial defense counsel moved for severance of the charges involving Irene S.

15   from the charges involving Nancy B.  The motion was denied.  On appeal, petitioner

16   conceded that the trial court did not abuse its discretion in denying his severance motion,

17   but argued that the conviction nevertheless must be reversed because joinder of the counts

18   deprived him of a fair trial or due process of law.

19         The court of appeal rejected petitioner's claim, holding as follows:

20              Here we have looked at the evidence actually introduced at trial and
      determined that no "'gross unfairness has occurred such as to deprive
21    [appellant] of a fair trial or due process of law.' [Citation]" (*People v. Bean*
      [(1988) 46 Cal.3d 919] at p. 940.)  Having reviewed the record, we find
22    neither actual nor potential prejudice such as to render the trial grossly unfair
      or deny due process.  At trial, both women testified to violent sexual assaults
23    perpetrated while they were homeless.  In each case, appellant used force
      and threats during the assaults and left both victims bruised and battered.
24    Furthermore, both victims positively identified appellant as their assailant, and
      DNA evidence corroborated Irene's testimony that appellant had ejaculated
25    on her face.

26              Appellant's characterization of Nancy B.'s case as weak and ordinary
      is not well taken.  Nancy B. testified that she was attacked on two separate
27    occasions.  During the first violent assault appellant raped her.  During the
      second, he forced her to orally copulate him.  Both assaults left her battered
28    and bruised.  Nancy B. reported these attacks to medical personnel when she

27

United States District Court

For the Northern District of California

1   was hospitalized, and to law enforcement when she had contact with Officer
2   Leon.

3       Appellant contends that joinder of the two cases resulted in gross
    prejudice because the multiple victim enhancement (Pen. Code, § 667.61,
4   subd., (e)(5)) [footnote omitted] would not have existed had the cases been
    tried separately.  We do not agree.  If appellant's cases had been tried
5   separately, the multiple victim enhancement could have been pled and
    proved and appellant would have been convicted in the "present case or
6   *cases* of committing [a specified sexual assault] against more than one
    victim."  (Pen. Code, § 667.61, subd. (e)(5), italics added.)

7   Ex. E at 22-23.

8       In the instant petition, petitioner claims that joinder of the counts against him violated

9   his federal constitutional right to due process.

10              *b.    Applicable Federal Law*

11      Joint trials conserve state funds, diminish inconvenience to witnesses and public

12  authorities, and avoid delays in bringing those accused of crime to trial.  *Bruton v. United*

13  *States*, 391 U.S. 123, 134 (1968).  Improper joinder does not, in itself, violate the

14  Constitution.  *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986).  However, a joinder of

15  counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in

16  violation of due process.  *See Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997); *Herd v.*

17  *Kincheloe*, 800 F.2d 1526, 1529 (9th Cir. 1986).

18      There is a "high risk of undue prejudice whenever . . . joinder of counts allows

19  evidence of other crimes to be introduced in a trial of charges with respect to which the

20  evidence would otherwise be inadmissible."  *United States v. Lewis*, 787 F.2d 1318, 1322

21  (9th Cir. 1986).  But joinder generally does not result in prejudice if the evidence of each

22  crime is simple and distinct (even if the evidence is not cross-admissible), and the jury is

23  properly instructed so that it may compartmentalize the evidence.  *Bean v. Calderon*, 163

24  F.3d 1073, 1085-86 (9th Cir. 1998); *see Davis v. Woodford*, 384 F.3d 628, 638-39 (9th Cir.

25  2004) (denial of motion to sever trial of capital and noncapital charges based on separate

26  incidents not a violation of due process because evidence was cross-admissible, the weight

27  of evidence with respect to each incident was roughly equal, the evidence as to each

28  incident was distinct, and the jury was properly instructed); *Sandoval v. Calderon*, 241 F.3d

28

United States District Court
For the Northern District of California

765, 773 (9th Cir. 2000) (given the strength of the prosecution's case against petitioner on both sets of murders and the cross-admissibility of the evidence on each set, petitioner's trial was not actually prejudiced by the joinder).

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials. *Grisby*, 130 F.3d at 370. Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution. *Id.* To prevail, therefore, the petitioner must demonstrate that the state court's joinder resulted in prejudice great enough to render his trial fundamentally unfair. *Id.* In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval*, 241 F.3d at 772.

c.   Analysis

In denying petitioner's claim, the California Court of Appeal relied upon California case law which holds that severance is required if joinder of the offenses resulted in "gross unfairness" and the "deprivation of a fair trial or due process." The court's analysis was not contrary to or an unreasonable application of governing federal legal principles. The court correctly identified the critical question whether petitioner's right to a fair trial had been prejudiced, and in order to make its determination looked to the similar, yet distinct, nature of the evidence presented in each case, the relative strength of each case, and whether a weak case had been joined with a strong one. The court also reviewed the trial record as a whole to see if petitioner had been prejudiced by the joinder. This comports with federal constitutional standards. *See Davis*, 384 F.3d at 638-39 (finding no prejudicial error where incidents were similar in many respects and weight of the evidence in both cases was roughly equivalent); *Sandoval*, 241 F.3d at 772-73 (finding no prejudicial error where evidence cross-admissible and no disparity in relative strength of joined counts). Review of the record also confirms that the court of appeal's conclusion was not based on an unreasonable determination of the facts in light of the entire trial record.

The state court's rejection of petitioner's claim was not contrary to, or unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or

1   based on an unreasonable determination of the facts in light of the evidence presented in

2   the state court proceedings, *id.* § 2254(d)(2).

3                                          **CONCLUSION**

4          For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

5          Petitioner's motion for an expedient hearing and determination of his case is

6   DENIED as moot.  (Docket no. 24.)

7          The clerk of the court shall enter judgment and close the file.

8          **IT IS SO ORDERED.**

9   Dated: 8/3/07          _____

10                                       PHYLLIS J. HAMILTON
                                         United States District Judge

11

12  G:\PRO-SE\PJH\HC.03\Cata3096.HabeasOrder.ECK

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
For the Northern District of California